Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Easterbrook | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 90 C 6933 | **DATE** | Oct. 2, 2001 |
| **CASE TITLE** | Pivot Point International, et al  v  Charlene Products, Inc., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Opinion entered. Accordingly, plaintiff's motion for sanctions is denied. Plaintiff's copyright registration of the "Mara" mannequin head is invalid. Defendants' "Liza" mannequin head does not infringe any of plaintiffs' intellectual-property rights. On all other claims, summary judgment is granted against the party making that claim and both the complaint and the counterclaims are dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | OCT 05 2001 | |
| | Notified counsel by telephone. | | date docketed | 401 |
| | Docketing to mail notices. | | | |
| X | Mail AO 450 form. | COPY FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 01 OCT -4 PM 2: 07 | | |
| GDS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# In the United States District Court
## for the Northern District of Illinois
### Eastern Division

DOCKETED
OCT 0 5 2001

PIVOT POINT INTERNATIONAL, INC.

v.

CHARLENE PRODUCTS, INC., *et al.*

No. 90 C 6933

Frank H. Easterbrook

## Opinion

EASTERBROOK, *Circuit Judge*.[†] Long delay rarely makes for better adjudication. This suit is 11 years old, and I am the fifth judge assigned to it. Prior judges have disagreed among themselves about important issues, and in what follows I continue that practice by disagreeing with one earlier decision (in the process restoring a decision that had been set aside). Moreover, my own work has not been exactly expeditious, and I apologize to the parties (and their lawyers) for dawdling in resolving this case after inviting additional motions for summary judgment. This opinion at last resolves the many issues now on the table and ends the litigation in this court.

The gist of this suit is Pivot Point's claim that defendants have sold long-neck mannequin heads known as "Liza" that infringe Pivot Point's copyright. This entails several subsidiary questions, including whether a mannequin head is copyrightable and whether defendants copied Pivot Point's mannequin (which Pivot Point calls the "Mara Sculpture" and I'll abbreviate to "Mara"). The appendix to this opinion contains pictures of Mara and Liza. The parties have come to blows on a plenitude of ancillary issues, such as whether defendants copied the numbers and descriptions in Pivot Point's catalog of mannequins and related supplies. Last July I issued an opinion tentatively resolving most of these issues and inviting comment from the parties before I came to a final conclusion. Those comments have been received and are reflected in this revised opinion, which now is final (and is accompanied by a final and appealable judgment).

1. The principal dispute is whether a human mannequin head is copyrightable subject matter. If it is, then there must be a trial on the question whether Liza is a knockoff of Mara. Each side seeks summary judgment on the question whether Mara is copyrightable. (Charlene Products also contends that the record does not support a conclusion that it copied from Mara. Judge Nordberg concluded otherwise earlier in the case, see 1994 U.S. Dist. LEXIS 8993 at *12 (N.D. Ill. June 29, 1994), and I agree with him—though not to the extent of thinking that the evidence in Pivot Point's favor is

---

[†] Of the Seventh Circuit, sitting by designation.

bound to persuade any reasonable jury. Copying is a *bona fide* dispute, though it turns out not to be legally material.)

Pivot Point contends that, because of Judge Nordberg's decisions, principally the opinion reported at 816 F. Supp. 1286 (N.D. Ill. 1993), the law of the case requires a denial of Charlene Products' motion. Yet Judge Nordberg's opinion disagreed with a still-earlier decision by Judge Parsons, to whom this case was initially assigned. See 1992 U.S. Dist. LEXIS 13752 (N.D. Ill. Sept. 11, 1992) (granting summary judgment to Charlene Products on the copyright issue). If it was proper for Judge Nordberg to set aside Judge Parsons's decision in defendants' favor, it is no less proper for me to inquire whether a material issue of disputed fact requires a trial. Identifying the rules of law that make a particular factual dispute legally "material" is essential to the process of trial planning; otherwise the proceedings deteriorate. It was my work on the motions in limine, which were to shape the issues and evidence for trial, that led me to wonder whether the controlling issues were not legal rather than factual in nature. Having given the subject additional thought, I now conclude that the principal dispute concerns the meaning of the Copyright Act, the sort of controversy that must be resolved in advance of trial.

Section 102(a)(5) of the Copyright Act, 17 U.S.C. §102(a)(5), declares that "pictorial, graphic, and sculptural works" are copyrightable. This is why Pivot Point refers to Mara as a "sculpture." But a definitional provision in §101 adds:

> "Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

Mara is a work of "applied art" and displays "artistic craftsmanship"—Pivot Point commissioned a sculptor to design a mannequin head that emulates features of runway models—but serves utilitarian ends: Students in beauty schools practice styling hair on Mara's head and may practice other skills by applying makeup to Mara's eyes, lips, and cheeks. The parties dispute which functions are primary. Charlene Products says that Mara is used primarily for practicing makeup; Pivot Point insists that its primary use is hair styling. This factual dispute might have legal significance if Pivot Point were contending that Mara's *sole* use is hair styling; then it is (barely) possible to imagine a suitable mannequin head devoid of human features. (The legal significance of this possibility is explicated below.) But Pivot Point contends only that Mara's "primary" use is hair styling; it does not deny that *a* use (if only, in its view, a secondary one) is the application of makeup and other beauty-school arts, and the evidence would not permit a reasonable jury to conclude that Mara has *no* utilitarian value for makeup practice. (Pivot Point says that it "generally" sells Mara with painted-on makeup, which reveals by negative implication that it *also* sells Mara without eye or cheek coloring, so that beauty-school students can add their own.)

Mara can be copyrighted "insofar as [its] form but not [its] mechanical or utilitarian aspects are concerned"—and then "only to the extent that [its] ... sculptural features that can be *identified separately from*, and are *capable of existing independently of*, the utilitarian aspects of the article." (Emphasis added.) Employment in practicing makeup skills is one "utilitarian aspect" of Mara. It has been registered, so it enjoys a presumption of protection, 17 U.S.C. §410(c), but the question remains whether that presumption survives an analysis of the statute. Because the Copyright Office has not explained its decision to register Mara and Liza, it does not receive the benefit of what must now be called *Mead–Skidmore* deference. See *United States v. Mead Corp.*, 121 S. Ct. 2164 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

The separate-identification ("conceptual separability") and separate-existence ("physical separability") requirements were added to the Copyright Act in 1976, in apparent response to the holding of *Mazer v. Stein*, 347 U.S. 201 (1954), that a sculpture of a dancer incorporated into the base of a lamp may be copyrighted. (The history is laid out in William F. Patry, 1 *Copyright Law & Practice* 256–76 (1994).) Congress codified the outcome of *Mazer*—for the sculptural elements could have been divorced from the lighting and sold separately—while limiting its potential for extension, which would blur if not eliminate the distinction between copyrights and design patents. An extension of *Mazer* to the design aspects of all utilitarian articles also would set at naught the principle of trademark law that a seller lacks intellectual-property rights in the functional aspects of its wares. See *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 121 S. Ct. 1255 (2001); *W.T. Rogers Co. v. Keene*, 778 F.2d 334 (7th Cir. 1985). Functionality is the domain of patent law. But all functional items have aesthetic qualities, which if copyrightable could produce a patent-like protection, and for a period well exceeding the length of a patent. See *American Dental Association v. Delta Dental Plans Association*, 126 F.3d 977, 980 (7th Cir. 1997). The statutory separability requirement confines copyright protection to those aspects of the design that exist apart from its utilitarian value, and that could be removed without reducing the usefulness of the item.

"Of the many fine lines that run through the Copyright Act, none is more troublesome than the line between protectible pictorial, graphic and sculptural works and unprotectible utilitarian elements of industrial design." Paul Goldstein, 1 *Copyright: Principles, Law & Practice* §2.5.3 at 99 (1989). Both physical separability and conceptual separability can be hard to pin down, because these are not natural attributes of the world but are legal constructs created to make subtle distinctions between copyright and patent (or trade dress) law. There is even debate about whether the statute contains one separability element or two—and, if one, *which* one (physical or conceptual separability).

Physical separability is the more understandable of the two, if also the more arbitrary. A lamp without a dancer carved into its base still illuminates the room, and a sculpture of a Balinese dancer may be sold separately. Likewise a decorated belt buckle may be sold as an *objet d'art* to someone who does not need it to hold up his pants. See *Kieselstein–Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980). But the general appearance (that is to say, the industrial design) of a lamp is not separable from the lamp itself, and thus may not be copyrighted. *Esquire, Inc. v. Ringer*, 591 F.2d 796 (D.C. Cir. 1978). Any other view would use the copyright laws to overturn *TrafFix* and many other cases holding that people are free to copy and sell useful articles that do not have patent protection. See, e.g., *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,

489 U.S. 141 (1989); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964). Using physical separability as a touchstone is arbitrary in the sense that it protects designs that could in principle have a separate existence even if that possibility is neither the source of the object's value nor likely to occur in the marketplace. It invites the question why this scope of protection, and not some other. But it has the virtue of being administrable by courts and of demarking the domains of copyright, patent, and trade dress from each other, and from the public domain. Treating physical separability as a requirement independent of conceptual separability also has the virtue of giving every phrase of the statute some work to do.

If physical separability is essential, then Mara is not copyrightable. A mannequin head without a neck, or with different eyes and musculature, would *not* serve as well, and would not serve at all to the extent that any part of Mara's utilitarian value is applying makeup or teaching the art of matching hair styles to facial features. Beauty students style hair to flatter the face, not to be worn on featureless ovoids. The use of a mannequin head in training students of beauty schools *lies in its aesthetic qualities*. Pivot Point set out to design a "realistic" mannequin not because more fashion-model-like qualities would be aesthetically pleasing, but because they would be *useful* in training students how to style hair. Attributes such as the length of the neck, the shape of the eyes and nose, and the articulation of the muscles and tendons in the neck and cheek, aren't separable from the mannequin head. A head removed from its neck or an eye socket detached from a face could not be used in beauty schools for either practice or display. A mannequin head with no neck, or with a nose but no cheeks, would be viewed as grotesque, and hence not useful in beauty schools. An ovoid shape with no eyes or nose could *hold up* a wig, but it would be less useful in teaching and making aesthetic choices that are important to beauty-school training. No surprise, then, that *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 418–19 (2d Cir. 1985), holds that mannequins of human torsos are not copyrightable sculptural works. It is hard to see why mannequins of human heads should be treated differently. Pivot Point does not try very hard to distinguish *Carol Barnhart*; its papers scarcely mention that decision, despite its considerable overlap with this case.

Conceptual separability differs from physical separability by asking not whether the features to be copyrighted could be sliced off for separate display, but whether one can conceive of this process. Relying on a comment in the House Report on the 1976 amendments, the second circuit in *Kieselstein–Cord* purported to adopt conceptual separability as the exclusive test (632 F.2d at 992, contrasting that approach with *Esquire*, which opted for physical separability, 591 F.2d at 803–04). Why a court should repair to the legislative history is unclear; the second circuit did not identify any ambiguity in §101 that needed to be resolved, and a statement in the House Report that what appears on the face of the statutory text to be two requirements (physical *and* conceptual separability) should be administered as just one is not a proposition that in today's legal climate can be indulged. The Supreme Court does not permit the use of legislative history to alter, as opposed to elucidate, a statutory text.

If the vice of the physical separability test is arbitrariness, the vice of conceptual separability (beyond faithlessness to the statute, if viewed as the *sole* requirement) is fuzziness. Judge Newman, dissenting in *Carol Barnhart*, collected four ambiguous definitions from the literature, disapproved all of them as too ambulatory or unjustified by the statutory text, and then offered a fifth that is no clearer. 773 F.2d at 421–22. Professor Patry offers a sixth version, *Copyright Law & Practice* at 285, and

Professor Goldstein a seventh, *Copyright: Principles, Law & Practice* at 109. The law review literature includes several more. Professor Goldstein's strikes me as the most direct: "a pictorial, graphic or sculptural feature incorporated in the design of a useful article is conceptually separable if it can stand on its own as a work of art traditionally conceived, and if the useful article in which it is embodied would be equally useful without it." This is clear and might be compelling; but its strength comes from the fact that it differs little, if at all, from the test of physical separability embraced by the D.C. Circuit in *Esquire* and by the majority in *Carol Barnhart*. (That panel purported to follow *Kieselstein-Cord* but effectively reinterpreted the earlier decision as resting on physical separability. Cf. *Brandir International, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142 (2d Cir. 1987), trying, without notable success, to harmonize *Kieselstein-Cord* with *Carol Barnhart*.)

Applying Professor Goldstein's approach leads to the conclusion that Mara cannot be copyrighted because, even though one can conceive of Mara as a sculpture displayed as art, it would not be *equally* useful if the features that Pivot Point wants to copyright were removed. So long as *a* utilitarian function is makeup tutoring and practice—and the fact that Pivot Point sells Mara without eye or lip coloring shows that this is *a* function even if not, in Pivot Point's view, the "primary" one—the utilitarian value would be diminished by removing the aesthetic features that Pivot Point wants to protect by copyright.

What is more, allowing Mara to be copyrighted would effectively give Pivot Point property rights in a broad range of "realistic" or "high fashion" mannequin heads, interfering with the scope of patent and trade-dress law. Pivot Point insists that its copyright is not limited to the precise features that Mara exemplifies. Mara is just one of many designs that Pivot Point offers. It sells "Madeline" with long blonde hair, "Sonja" with angora yak hair, versions with Asian and African facial features, and a dozen other variations; all are within the "Mara" copyright, Pivot Point believes, because the facial features of these mannequins all have the same aesthetic qualities as Mara. This demonstrates that Pivot Point wants to copyright a *style* of mannequin, and no sensible reading of the 1976 Act permits that step. Pivot Point responds that it claims copyright only in Mara's nose, eyes, musculature, and so on, and that every face is unique, but if this is so then Liza does not infringe. Liza has a face that differs from Mara's. Liza does, however, convey an impression similar to Mara's, which under copyright law may be enough under the "abstractions" approach Learned Hand articulated in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930). See also *Nash v. CBS, Inc.*, 899 F.2d 1537 (7th Cir. 1990). By contending that Liza infringes the Mara copyright, Pivot Point demonstrates that its claim embraces an aesthetic style rather than a precise set of features.

Before closing this discussion I must discuss two additional mannequin cases, *Hart v. Dan Chase Taxidermy Supply Co.*, 86 F.3d 320 (2d Cir. 1996), and *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488 (4th Cir. 1996). Both hold that in principle mannequins used in taxidermy may be copyrighted as sculptural works. What's the difference between animal mannequins and human mannequins? The second circuit, which issued both *Carol Barnhart* and *Hart*, saw a difference—but, as Professor Patry aptly remarked, the difference Judge Calabresi (the author of *Hart*) perceived has nothing to do with either physical or conceptual separability. Patry, *Copyright Law & Practice* 15 (1997 Supp.). The central conclusion of *Hart* is that a fish mannequin, unlike the mannequin of a human torso, displays artistic originality. Yet

*Carol Barnhart* did not deem the torso mannequin non-copyrightable for lack of originality (or other artistic virtue); the court's point was that the artistic features of the mannequin could not be separated, as §101 requires, from its utilitarian aspect. One could say much the same of a mannequin used to mount a swordfish or the head of a wild boar. *Hart* leaves the law of the second circuit in a most unsatisfactory state.

*Superior Form Builders* did not need to distinguish *Carol Barnhart* but did so anyway, on the principal ground that animal mannequins are not "useful articles" and that the whole apparatus discussed above therefore does not apply. 74 F.3d at 493–94. "Useful article" is a term defined in §101 this way: "[A]n article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." The fourth circuit apparently thought that an animal mannequin portrays *its own* appearance even after covered by animal hide, and therefore is not a "useful article," although it serves as an internal frame for (say) a moose's head and antlers. That seems to me implausible as applied to moose; guests in a trophy room or museum do not gush over the outline of the apparatus that supports the antlers, even if the mannequin greatly improves the shape of the moose's snout. An animal mannequin is valued for its ability to hold up and fill out the animal on display, not for "its own appearance". *Superior Form Builders* went on to say that it would be inclined to disagree with *Carol Barnhart* on the separability question, 74 F.3d at 494, but did not explain how *Carol Barnhart* erred—or even recognize that physical separability differs from conceptual separability. At all events, one cannot say of Mara what the fourth circuit said of animal mannequins: Mara is valued not for "its own appearance" but for what it enables students to do and learn. Mara is a "useful article" as §101 and *Superior Form Builders* deploy that term.

2. The parties' dispute about product numbers and descriptions—issue A.10 in my order resolving evidentiary disputes, see 932 F. Supp. 220, 225 (N.D. Ill. 1996), and now subject of both a motion for reconsideration and a renewed motion to exclude—stems from Pivot Point's belief that Charlene Products distributed catalogs and other material that contain numbers and descriptions copied out of Pivot Point's catalogs. It calls this use "unfair competition". Although opinions such as *American Dental Association* could support a claim under the copyright laws, Pivot Point does not invoke either copyright law or trademark law in this respect, which raises a question whether it can argue generic "unfair competition" to extirpate reproduction that the copyright and trademark (including trade dress) doctrines permit. Reproduction of materials that are outside copyright and trademark protections is common and essential to competition. See *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991). See also, e.g., *TrafFix*, *Bonito Boats*, and *Stiffel*.

The parties' evidentiary dispute concentrates on whether Charlene Products copied the materials or derived them independently. Pivot Point seeks to prove copying by excluding the possibility of independent creation. The motion in limine handled previously as No. A.10 sought to prohibit Charlene Products from proving at trial that it had any source *other* than Pivot Point's catalogs for the descriptions. I concluded that a motion in limine is the wrong way to proceed—that what Pivot Point really seeks is a discovery sanction to punish Charlene Products for inadequate pretrial disclosure of alternative sources. I suggested that Pivot Point make a request for admissions under Fed. R. Civ. P. 36.

This is the step that Charlene Products asks me to reconsider. Because all my prior order did was postpone decision until Pivot Point made the request for admissions, I don't see what can be reconsidered. (Charlene Products' belief that it has been forthcoming in discovery and has identified another source for the descriptions is neither here nor there for this purpose.) For its part, Pivot Point has followed up with a request to admit and, deeming the answer inadequate, asks me once again (on the authority of Fed. R. Civ. P. 36(a) and 37) to block Charlene Products from attempting at trial to show any other source for the numbers and descriptions.

Pivot Point demanded that Charlene Products admit or deny that it took the numbers and descriptions from Pivot Point's catalogs. Charlene Products has answered with one word: "Deny." My prior order said that in such an event "Charlene Products must come up with some other source (or face the heavy penalties associated with wrongful failure to admit)." 932 F. Supp. at 225. So what is Charlene Products' other source? Peter Yau, who put together the Charlene Products catalog said to violate Pivot Point's rights, has insisted throughout discovery that he copied the material from sources other than Pivot Point's catalogs but has not identified the precise other source. This could make it hard to see how a reasonable jury could find that Yau had a source other than Pivot Point's catalogs. And if a reasonable jury could not find that there is another source, what would be the point of a trial on this subject? See *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). As I wrote the last time around, however, Pivot Point really is seeking a grant of partial summary judgment—or perhaps just a statement that there is no *material* dispute on an issue of fact—rather than a ruling granting a motion in limine.

Defendants could show that there is a material dispute if they could point to some other source for the contents of their catalog. Yau says that there *was* some other source, which he can't remember precisely. If defendants could identify sources other than Pivot Point's catalogs from which the numbers and descriptions *could* have come, that would yield a material dispute, requiring a jury's resolution, whether those were the actual genesis. Defendants refer to materials distributed by Dragon Industries Co. and I.B.G. Beauty Supplies Co. and say that they contain numbering systems and descriptions that are common in the industry. That may be so, though the references in defendants' filings are maddeningly vague (and Pivot Point observes that some of these materials bear dates after 1988, when Charlene Products issued the catalog containing the materials supposedly copied from Pivot Point). Other materials that defendants proffer are undated and thus might have been Yau's sources. But it is best to assume for the sake of argument that Yau copied from Pivot Point's catalogs and to ask directly whether that is wrongful, when neither copyright nor trademark doctrines protect the contents of Pivot Point's catalogs.

Pivot Point relies on state laws forbidding unfair competition (Illinois law in this case, but the identity of the state is irrelevant). Yet states cannot create rights in intellectual property that are incompatible with national legislation. This point is hammered home by §301(a) of the Copyright Act, 17 U.S.C. §301(a), which preempts any "legal or equitable rights [under state law] that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103". The seventh circuit held in *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (1996), and *Baltimore Orioles, Inc. v.*

*Major League Baseball Players Ass'n*, 805 F.2d 663, 676 (1986), that material fixed in a tangible medium is "within the subject matter of copyright" for the purpose of preemption even if, after *Feist*, it is not sufficiently original to be copyrighted. *ProCD* added that rights conferred by state unfair-competition law are "equivalent to any of the exclusive rights" if they prohibit strangers from copying written material. That is just the use to which Pivot Point wants to put state unfair-competition laws, and that application is therefore preempted by §301(a).

*ProCD* went on to hold that claims based on contract are not preempted by §301(a) because private agreements are not "equivalent to" any of the federal exclusive rights. 86 F.3d at 1454–55. Pivot Point does not contend, however, that defendants have broken any contract. Pivot Point does rely on a second potential exception to §301(a): Uses that are not "equivalent to" the *copyright* rules because they are more like *trademark* rules. Copied information that may mislead consumers about the source or origin of goods may be prohibited independently of copyright-like rules. See *Nash v. CBS, Inc.*, 704 F. Supp. 823, 832–33 (N.D. Ill. 1989), affirmed on other grounds, 899 F.2d 1537 (7th Cir. 1990). But although it adverts to this principle, Pivot Point does not say in so many words that Charlene Products has distributed materials that do (or even could) confuse purchasers about the source of its products. Pivot Point filed, and then dismissed, a claim under the Lanham Act. I therefore must assume that defendants' materials would not confuse prospective buyers about the source of the goods defendants offer for sale. Defendants are entitled to summary judgment on this aspect of Pivot Point's state-law unfair-competition theory. The evidentiary dispute now is beside the point and need not be resolved.

Preemption also knocks out the claims (and counterclaims) about supposedly unfair trade practices in selling Mara and Liza. Neither mannequin is copyrightable, and therefore Charlene Products was free to use Mara's form (as Pivot Point is free to borrow from Liza's). Although Pivot Point makes noises about misrepresentation—a claim that would survive preemption—it does not develop any claim that Charlene Products misled buyers into thinking that Liza is *made by* Pivot Point.

3. Some other unfair-competition theories are, or were, in the case and remain to be considered. For example, Pivot Point's complaint suggests that defendants violated its rights by soliciting customers from a particular list of beauty schools. Defendants filed a motion seeking summary judgment with respect to this claim; Pivot Point responded that it had already abandoned this theory but that defendants had not noticed. I need not figure out just when the claim disappeared from the case; it is gone.

Yet another claim arises from the fact that both Pivot Point and Charlene Products sell acrylic bone combs. Pivot Point uses the mark "Bohn" for its combs, while Charlene Products uses the mark "Born". Charlene Products seeks summary judgment on Pivot Point's claim that the Born mark infringes its Bohn mark. (Defendants' initial papers sought dismissal of the complaint under Fed. R. Civ. P. 12(b)(6), but follow-up filings make it clear that their request rests on Fed. R. Civ. P. 56.)

"Bohn" is a homophone of "bone" and accordingly cannot be treated as a suggestive, arbitrary, or fanciful mark that may be protected without proof of secondary meaning. See *Standard Paint Co. v. Trinidad Asphalt Manufacturing Co.*, 220 U.S. 446 (1911); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977). To get anywhere Pivot Point must establish that potential customers associate Bohn

combs with Pivot Point; or, in a weaker version, must establish a likelihood of confusion (in other words, that customers seeking Pivot Point's BOHN combs might go to Charlene Products and end up with BORN combs). See *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992); *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041 (7th Cir. 2000); *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909 (7th Cir. 1996); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055 (7th Cir. 1995); *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616 (7th Cir. 1995). This record contains no evidence of either secondary meaning or confusion.

Pivot Point asserts: "For almost 10 years, Pivot Point has used and advertised the 'BOHN' mark in connection with its beauty combs. As a result, Plaintiff has developed secondary meaning in the mark." This causal link may or may not exist; it is not self-evident. A connection between BOHN and Pivot Point *might* develop as a result of advertising and sales, but perhaps it did not. Other firms also use the mark BOHN in connection with combs. Perhaps buyers associate BOHN with those firms, or with no firm at all (taking it as descriptive, like "Lite" beer). Whether consumers *do* think Pivot Point when they see the word BOHN is a question of fact, on which Pivot Point has produced no evidence. Nor has Pivot Point identified even a single befuddled buyer who went to Charlene Products in search of a BOHN comb. Both Pivot Point and Charlene Products sell to the beauty-supplies trade, so the casual treatment of origin that often marks purchases of low-price products to ultimate consumers is not in prospect. The record does not contain survey evidence that might make up for the lack of anecdotal consumer evidence. This is as vacuous a trademark claim as one can imagine—and it does not acquire substance by being relabeled "unfair competition" instead of "trademark infringement." Defendants are entitled to summary judgment on this claim.

Another summary-judgment motion fits in this category. Charlene Products asks for decision as a matter of law on *all* of Pivot Point's unfair-competition and deceptive-trade-practice claims, contending that the record does not establish that Pivot Point suffered any loss. To the extent this just restates the fact that Pivot Point lacks evidence of diverted sales, it is redundant.

Next I take up Pivot Point's contention (reflected in Counts III and IV of its most recent amended complaint) that Charlene Products committed a business tort by distributing at a trade fair a packet of information that included earlier judicial opinions in this case, Pivot Point's copyright registration for Mara, and Pivot Point documents (apparently obtained in discovery) with outdated price quotations. Pivot Point does not reveal how it hopes to show that dissemination of judicial opinions and papers from the Copyright Office are tortious. The label "unfair competition" does not fit—and there is a privilege to disseminate official documents of the federal government. Handing out materials obtained in discovery could be sanctionable (under federal, not state, law) if they were covered by a protective order, but these are not. What I have already said about Charlene Products' use of Pivot Point's catalogs (see §2 above) squelches any contention that dissemination could be a state tort, apart from copyright claims; and Pivot Point does not argue that distribution of any internal document infringes its copyright in that document. Thus the state-law claims grouped into Pivot Point's Counts III and IV must be dismissed.

Finally (for this category at least), defendants have filed several counterclaims that present unfair-competition or related theories. Most of these have fallen by the way-

side. Responding to my tentative opinion, defendants identified only two that remain: counterclaim II for unfair competition, and VI for tortious interference with prospective economic advantage. Given the decisions in 1996 on the many motions in limine, however—see 1996 U.S. Dist. LEXIS 7023 (N.D. Ill. May 21, 1996) (Keyes, M.J.), modified by 932 F. Supp. 220 (N.D. Ill. 1996)—there is nothing much that defendants can prove. All that is left is a statement by Leo Passage, Pivot Point's president, to unknown persons at a trade show that Charlene Products makes knockoffs. Why that statement is tortious is obscure. Making knockoffs is a lawful business strategy. Defendants' recent filings request a trial but do not identify any material factual dispute that could be resolved. Animadversions about unfair competition just do not cut the mustard; there must be specific claims that can be matched to specific rules of law, and these details are missing from defendants' presentations.

4. Next comes defendants' motion for reconsideration of my ruling excluding at trial evidence of Pivot Point's financial status (issue A.2 in the prior order). Defendants point out that they seek punitive damages under state as well as federal law, and that Illinois treats wealth as a permissible consideration in setting the amount of punitive damages. See *Howard v. Zack Co.*, 264 Ill. App. 3d 1012, 1028, 637 N.E.2d 1183, 1194 (1st Dist. 1994). The point is well taken. If any state-law claim supporting punitive damages survives to trial, financial details could be received, limited to this subject. This also would require bifurcation of liability from damages proceedings, as I think it inappropriate to allow this prejudicial and otherwise-irrelevant information to affect the resolution of any issue in the case other than punitive damages. But as far as I can see no such claims remain for trial, and this decision therefore would be important only in the event of a remand on one or more of the state-law questions.

5. Pivot Point's motion for sanctions under Fed. R. Civ. P. 11 is easy to handle. It is denied. Pivot Point believes that Charlene Products has filed frivolous pleadings by continuing to deny that Mara is copyrightable, while simultaneously obtaining a copyright registration for Liza. This is at worst inconsistent, and the rules allow inconsistent pleadings. Fed. R. Civ. P. 8(e)(2). A litigant may hedge its bets, as Charlene Products has done by arguing that mannequin heads cannot be copyrighted, at the same time seeking protection for its own intellectual property in the event the court disagrees. This common litigation (and business) strategy cannot be sanctioned as frivolous.

6. Last come two housekeeping matters. Defendants' Motion to File Instanter Copies of Pleadings and to Correct the Record and Docket Nunc Pro Tunc to Reflect Filings of Originals on Previous Dates is granted. Defendants' Motion for Leave to Supplement Statements of Uncontested Facts with a Description of Parties and Facts Supporting Jurisdiction and Venue likewise is granted.

7. Where does this leave matters? There are, I think, no claims remaining for trial. Defendants have sought, and are entitled to, a declaratory judgment that Mara is not copyrightable subject matter and that the copyright registration therefore is invalid. On all other claims summary judgment is granted against the party making that claim, and the case will be closed with a take-nothing judgment.

*Frank H. Easterbrook*

Frank H. Easterbrook

October 2, 2001

Mara



Liza

